UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STAGWELL INC.<br>One World Trade Center, Floor 65<br>New York, New York 10007<br><br>    Plaintiff,<br><br>            - v -<br><br>CANACCORD GENUITY LLC<br>535 Madison Avenue<br>New York, NY 10022;<br><br>CANACCORD GENUITY PETSKY PRUNIER LLC<br>33 Whitehall Street, 27th Floor<br>New York, NY 10004;<br><br>and<br><br>SANJAY CHADDA<br>150 Charles St, Apt. M9<br>New York, NY 10014.<br><br>    Defendants. | Civil Action No.: 22-CV-10647<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# COMPLAINT

1. Plaintiff Stagwell Inc. ("Stagwell" or "Plaintiff"), by its attorneys, brings this action against Defendants Canaccord Genuity LLC ("Genuity"), Canaccord Genuity Petsky Prunier LLC ("Petsky"), and Sanjay Chadda (together "Defendants") and alleges as follows:

2. Stagwell seeks to hold Defendants accountable for their "pay to play" scheme by which Defendants have excluded Stagwell from participating in the sale and purchase of digital advertising, marketing technology, and digital media companies brokered by Defendants.

3. Defendants have formed an enterprise to exclude, and to continue to exclude, Stagwell and Stagwell's portfolio companies as punishment for The Stagwell Group's refusal to pay Mr. Chadda a $1.5 million kickback fee for a transaction on which he performed no work. As a result of The Stagwell Group's refusal to pay Mr. Chadda, Defendants have engaged in a malicious campaign to wrongfully exclude Stagwell and its portfolio companies from lucrative deals and to make false and damaging statements about Stagwell in the marketplace.

4. As a result of Defendants' wrongful exclusion of Stagwell and its portfolio companies, they were blocked from completing desirable strategic acquisitions and have been denied the opportunity to complete additional acquisitions going forward.

5. Defendants' punitive exclusion of Stagwell and its portfolio companies has harmed Defendants' own clients by denying them the increased value that would have resulted had Stagwell and its portfolio companies been provided the opportunity to bid on and purchase the companies Defendants were marketing for sale.

**PARTIES**

6. Plaintiff Stagwell Inc. is a Delaware corporation with its principal place of business in New York, New York. Stagwell is a full-service global marketing and communications group that works with a robust and steadily growing portfolio of affiliated companies.

7. Defendant Canaccord Genuity LLC ("Genuity") is a limited liability company organized under the laws of Delaware with its principal place of business in New York, New York, which operates as an investment banking firm.

8. Defendant Canaccord Genuity Petsky Prunier LLC ("Petsky") is a limited liability company organized under the laws of Delaware with its principal place of business in New York, New York.

9. Defendant Sanjay Chadda is a resident of New York, New York. He is the Managing Director and Partner of Petsky and, since February 2019, has also been a member of Genuity's management operating committee and co-leader of Genuity's U.S. investment banking group.

## JURISDICTION AND VENUE

10. This court has original jurisdiction of this case pursuant to 28 U.S.C. § 1331 (federal question) because this civil action arises under the laws of the United States, and it possesses supplemental jurisdiction over Plaintiff's non-federal claim pursuant to 28 U.S.C. § 1367(a).

11. The Court has personal jurisdiction over Defendants because, *inter alia*, Defendants transact business and/or reside in New York, New York and own, use, and/or possess real property within New York, New York.

12. Venue is proper in this district under 28 U.S.C. § 1391(a) and (b) because it is where all three defendants reside and where a substantial part of the events or omissions giving rise to Stagwell's claims occurred.

**FACTUAL BACKGROUND**

**A.    Relevant Background of the Parties.**

13.    Defendant Genuity is an investment bank that, among other things, provides merger and acquisition advisory and capital raising services to its clients.

14.    Defendant Petsky advertises itself as a leading investment bank to the technology, media, marketing, information, e-commerce, and healthcare industries.  It claims to represent one of the largest industry-specific advisors providing strategic and transactional services.  Petsky also boasts one of the most comprehensive databases in the business with over 30,000 company profiles.

15.    In February 2019, Genuity acquired Petsky.

16.    Genuity and Petsky are separately registered New York companies.

17.    Defendant Chadda is Petsky's Senior Managing Director, Co-head of US Investment Banking, and Co-head of U.S. Technology, Media, Marketing & Information Services Investment Banking.  Mr. Chadda joined Canaccord Genuity through its acquisition of Petsky Prunier and co-heads one of the most active investment banking practices on Wall Street focused on the broader media, digital advertising and marketing, commerce, information and marketing technology and services industries. He is also active in the firm's marketing, recruiting, and strategic initiative activities.

18.    Stagwell is a global marketing network that provides its clients with integrated marketing strategies by evolving their creative, media, technology, digital platforms, audiences, and products to create fully integrated marketing strategies that drive impactful results.  Stagwell works with a portfolio of affiliated companies in various market sectors to provide robust client services across a broad spectrum of the relevant industry.

19. For many years, Stagwell (through The Stagwell Marketing Group and Stagwell Media LP, the holding company that contributed portfolio agencies to Stagwell Inc.) has been an avid acquirer of media and technology companies. Since 2015, in addition to completing its strategic combination with MDC Partners Inc. ("MDC") in 2021, The Stagwell Group (or affiliated entities at the time) and now Stagwell have acquired more than 35 companies, including the purchase of one of the United Kingdom's largest independent media companies within the past year. Stagwell has stated its intention to invest hundreds of millions of dollars in global investments in the next few years.

20. Prior to Genuity acquiring Petsky, the two firms were competing investment banks.

21. Prior to its acquisition by Genuity, Petsky would include The Stagwell Group, when seeking purchasers for a client in an industry space of interest to The Stagwell Group.

22. After the Genuity acquisition, Petsky, through Mr. Chadda, continued to provide certain advising services to The Stagwell Group, and Petsky would include The Stagwell Group when brokering the sale of relevant companies.

23. As a participant in the sale process, The Stagwell Group previously had been given the opportunity to bid on companies that Defendants would broker for sale.

24. As described herein, Defendants abruptly ended this productive relationship, and since the Stagwell-MDC combination, have formed an enterprise to systematically exclude Stagwell, as the successor in business interests to The Stagwell Group, and its portfolio companies from participating in the purchase and sale of those companies brokered by Defendants.

25. Defendants exclude Stagwell solely due to the animus, and at the behest, of Mr. Chadda, specifically because Stagwell chose not to engage Mr. Chadda—who is also the co-head of Genuity's US investment banking practice—as a "consultant" on the Stagwell-MDC combination.

26. Defendants' exclusion of Stagwell and its portfolio companies has harmed Stagwell by denying Stagwell and its portfolio companies the ability to purchase companies for which they were interested in making the most attractive offer, and it has harmed Defendants' clients by denying them the increased purchase price and opportunities that would have resulted from Stagwell's and its portfolio companies' participation.

27. Simply put, Defendants excluded Stagwell not for any legitimate business, economic, or competitive reason, but solely to punish Stagwell and its portfolio companies as part of a coordinated campaign to harm Stagwell and damage its reputation in the marketplace.

**B. Stagwell Rejects Chadda's Request for Payment.**

28. In 2019, The Stagwell Group was considering various strategic corporate transactions, including a potential sale of the company. The Stagwell Group engaged Mr. Chadda on a success-based objective to run a process to solicit interest.

29. When Mr. Chadda failed to deliver purchasers at the valuation levels he promised, The Stagwell Group opted to pursue an alternative transaction; specifically, a corporate combination with certain of its affiliates and MDC (the "Stagwell-MDC Combination").

30. After being informed of The Stagwell Group's decision to pursue the Stagwell-MDC Combination, Mr. Chadda asked to be included in the contemplated Stagwell-MDC Combination.

31. On or about May 20, 2020, Mr. Chadda sent The Stagwell Group a proposed letter agreement ("Chadda's proposal"), in which The Stagwell Group would pay $1 million, plus an additional $500,000 in incentive-based payments.

32. Given that Mr. Chadda had not provided The Stagwell Group with services relating to the Stagwell-MDC Combination and such services were unnecessary, The Stagwell Group did not sign Chadda's Proposal.

33. In August 2021, Stagwell Media LP, an affiliate of The Stagwell Group, contributed certain assets in a transaction with MDC to form Stagwell Inc. and complete the Stagwell-MDC Combination.

34. Although The Stagwell Group did not engage Petsky, Chadda, or Genuity, Genuity was ultimately paid more than $1 million for advisory services it provided to MDC relating to valuing the asset contributions of Stagwell Media and MDC for the Stagwell-MDC Combination.

**C.    Defendants Exclude Stagwell from Lucrative Transactions.**

35. Prior to The Stagwell Group's rejection of Chadda's proposal, The Stagwell Group was regularly included as a prospective purchaser in various deals that Defendants had been hired to broker.

36. Defendants have subsequently denied, and continue to deny, Stagwell any opportunity to participate in deals of interest to Stagwell, including deals in which Stagwell would likely have been the ultimate purchaser.

37. Since February 2019, Mr. Chadda has been the co-head of Genuity's Investment Banking Group.

38. Despite Genuity having received over $1 million for its role in the Stagwell-MDC Transaction, Mr. Chadda remained resentful of the fact that The Stagwell Group rejected Chadda's proposal.

39. Mr. Chadda used his influence with Petsky and Genuity to enlist them in an enterprise to exclude Stagwell as punishment for The Stagwell Group's refusal to pay Mr. Chadda $1,500,000 for no services rendered, as he had demanded.

40. Defendants' punitive exclusion of Stagwell extends beyond Stagwell to Stagwell's portfolio companies.

**D.     Defendants Disparage Stagwell.**

41. As part of this enterprise, Defendants have also undertaken efforts to harm Stagwell's reputation in the marketplace through false and fraudulent statements impugning Stagwell's legitimacy as an acquirer of technology and marketing companies such as those that are brokered and sold by Defendants.

42. Defendants have knowingly made false statements with the intention of inflicting harm on Stagwell.

43. For example, JP Michaud, who is both Genuity's Managing Director and a principal of Petsky, informed Y Media Labs LLC ("YML"), a Stagwell portfolio company offering digital products and experiences, that Defendants would not permit Stagwell or YML to participate in the sale process Defendants were running for a client that YML had targeted as a potential acquisition.

44. In an email to YML's Chief Executive Officer and Chief Financial Officer, Mr. Michaud stated, "[u]nfortunately, we won't be able to have Stagwell / MDC / YML participate in this process given prior history with the Stagwell organization. At this stage, we don't believe

Stagwell to be a credible acquirer for the companies we represent. Happy to have a phone call to provide more color if you would like, just let us know."

45. Mr. Michaud copied Mr. Chadda on his email.

46. Through this message disparaging Stagwell, Defendants rejected YML's request to participate in the purchase and sale process that Defendants were brokering for a company that YML and Stagwell were interested in pursuing.

47. By offering "to have a phone call to provide more color," Defendants created the false impression that the disparaging statement about Stagwell was supported by undisclosed facts.

48. At the time of the statement, YML was run as a largely independent company where the founders were on an earnout based on maximizing YML's growth and profitability.

49. Defendants' false statements damaged Stagwell's reputation with YML, including but not limited to causing YML and its principals to believe that their affiliation with Stagwell would impede their ability to make valuable corporate acquisitions and maximize YML's value.

50. On information and belief, Defendants have made the same and similar statements to others in a further effort to damage Stagwell's reputation in the marketplace.

**E.      Stagwell Is a Credible Acquirer.**

51. Defendants knew that the assertion that Stagwell is not a "credible acquirer" was false, and they made their false statements with the intention of punishing Stagwell for The Stagwell Group's refusal to "pay to play" pursuant to Defendants' scheme.

52. At the time of the statement, Defendants knew that Stagwell was one of the most prolific acquirers in the industry over the preceding years—*i.e.*, that Stagwell is, in fact, a credible acquirer.

9

53. Indeed, in 2019 alone, The Stagwell Group made eight additional major acquisitions, all of which would be known to Defendants.

54. Stagwell's robust acquisition activity following the August 2021 Stagwell-MDC Combination was reported in the press and well known in the industry.

55. In January 2022, Stagwell's acquisition of one of the UK's largest independent media agencies was announced and covered in press reports.[1]

56. Stagwell has publicized its intention to spend hundreds of millions of dollars in the coming years on global acquisitions.[2]

57. Further, Stagwell's Chief Investment Officer has been lauded for his investment prowess and speed of capital deployment.[3]

**F.   Defendants' Exclusion and Disparagement of Stagwell Has Harmed Stagwell.**

58. Defendants have prevented Stagwell from making strategic acquisitions that would have substantially increased Stagwell's value.

59. Defendants' retaliatory acts and defamatory statements are not simply the unprofessional action of one employee, but rather a coordinated effort directed by Defendants to defame and damage Stagwell and its portfolio companies and to deny them the opportunity to expand through additional lucrative acquisitions brokered by the Defendants.

60. Mr. Chadda is well known in the industry as a prolific middle market banker who is involved in many large, profitable deals. He co-heads "one of the most active investment

---

[1] *See* https://www.thedrum.com/news/2022/01/04/stagwell-group-acquires-goodstuff-drive-rival-legacy-holding-companies-continues.

[2] *See* https://www.dailyadvent.com/news/85bfd06c5e3a4ba82889d63f6647d147-Mark-Penns-newly-formedStagwell-is-planning-a-425-million-global-acquisition-spree-as-it-tries-to-take-on-bigger-ad-agency-groups-like-WPP.

[3] *See* https://digiday.com/marketing/creating-a-loose-federation-stagwell-groups-jason-reid-is-buying-pieces-of-the-next-agency-holding-company/.

banking practices on Wall Street" and has "led more than 150 transactions during his career."[4] He is a clear asset to Defendants, and his deals result in substantial financial gain for Defendants. Defendants recognize the value that Mr. Chadda brings as Managing Director to both the U.S. Investment Banking and the Tech and Media groups at Genuity. It behooves Defendants to keep Mr. Chadda satisfied.

61. Defendants' statements and purposeful exclusion of Stagwell and its portfolio companies as acquirers have injured Stagwell in the market generally.

62. Defendants' statements and actions have damaged Stagwell's reputation and relationship with its portfolio companies, including YML.

63. Defendants have prevented YML and other Stagwell portfolio companies from participating in Defendant-brokered deals solely because of The Stagwell Group's refusal to pay Mr. Chadda.

64. There is no legitimate economic, business, or competitive reason for Defendants to exclude Stagwell and its portfolio companies from their sale processes and to disparage Stagwell with false statements in the marketplace.

65. By cutting out Stagwell—a prolific acquirer—and its portfolio companies, Defendants have harmed competition generally and their clients specifically by, among other things, failing to maximize the value for which their client companies are sold.

66. Defendants have thus prioritized their campaign to damage Stagwell and its portfolio companies above their own clients' interests and are actively injuring Stagwell and its

---

[4] *See* https://www.canaccordgenuity.com/capital-markets/about-us/contacts/new-york/sanjay-chadda/.

portfolio companies notwithstanding that this also harms Defendants' own clients by eliminating potential acquirers from the sale process.

## FIRST CAUSE OF ACTION
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### (vs. All Defendants)

1. Stagwell repeats and realleges the foregoing allegations as if fully set forth herein.

2. From May 2020 (said date being approximate and inclusive) and continuing through the present, Genuity, Petsky, and Chadda collectively have constituted an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) or, alternatively, an association-in-fact enterprise within the meaning of those provisions.

3. Because The Stagwell Group would not agree to pay Mr. Chadda $1.5 million in connection with the Stagwell-MDC Combination, Defendants have engaged in a coordinated campaign to exclude Stagwell and its portfolio companies from participation in the sale and acquisition of the companies brokered by Defendants.

4. As described above, Defendants conspired and agreed to a punitive scheme that involved excluding Stagwell and its portfolio companies from dozens of potential acquisitions. In furtherance of this scheme, Defendants took affirmative steps to blacklist Stagwell and its portfolio companies from any potential participation in acquisitions of target companies, including by publishing false and defamatory statements.

5. Defendants' enterprise and that enterprise's exclusion of Stagwell and Stagwell's portfolio companies have denied Defendants' own clients the benefits of the participation of Stagwell and Stagwell's portfolio companies in the purchase and sale of Defendants' clients' companies.

6. Since May 2020, the Defendants engaged in a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(A) and (B) described above and other predicate acts to be identified after further investigation and discovery herein.

7. Defendants engaged in two or more predicate acts of racketeering, including extortion. The predicate acts of racketeering activity were related in that they were committed for the purpose of punishing and excluding Stagwell and its portfolio companies from acquisition processes, and to perpetuate Defendants' pay-to-play scheme.

8. On May 20, 2020, Mr. Chadda sent a proposed agreement to The Stagwell Group pursuant to which The Stagwell Group would pay Mr. Chadda $1.5 million as part of the Stagwell-MDC Combination, notwithstanding that Mr. Chadda would provide no relevant services to The Stagwell Group relating to that transaction. The Stagwell Group refused to sign the agreement.

9. After The Stagwell Group's refusal to pay Mr. Chadda, Defendants engaged in their coordinated campaign to exclude Stagwell and Stagwell's portfolio companies from participating in the purchase and sale of companies brokered by Defendants.

10. Defendants formed an enterprise to accomplish their purpose of blacklisting Stagwell and Stagwell's portfolio companies, despite the resulting harm caused to Defendants' own clients, which were denied the opportunity to enter lucrative transactions with Stagwell and Stagwell's portfolio companies as a result of Defendants' campaign against them.

11. As part of their ongoing efforts to exclude Stagwell, Defendants have made false and disparaging statements about Stagwell in the marketplace in which they indicate that they are

privy to facts that demonstrate Stagwell is not a credible acquirer of the exact type of mid-market technology and marketing companies that Stagwell is actively attempting to acquire.

12. Indeed, Defendants made precisely such a statement—that "given prior history with the Stagwell organization . . . we don't believe Stagwell to be a credible acquirer for the companies that we represent"—through a corporate officer, to YML, a Stagwell portfolio company, when YML had inquired into Petsky's brokering of a company of interest to YML and Stagwell. By offering to provide "more color," Mr. Michaud falsely indicated that there were legitimate underlying factual bases for the false statement about Stagwell.

13. To underscore the point that Stagwell and YML, as a Stagwell portfolio company, were being blacklisted due to The Stagwell Group's refusal to pay Mr. Chadda in connection with the Stagwell-MDC Combination, Mr. Michaud copied Mr. Chadda on his communication to YML.

14. On information and belief, Defendants have made the same or similar false and disparaging statements about Stagwell to others, including but not limited to their own clients, in furtherance of their blanket exclusion of Stagwell and its portfolio companies from the purchase and sale transactions brokered by Defendants.

15. Stagwell has in fact been damaged by Defendants' blacklisting of Stagwell and Stagwell's portfolio companies in that Stagwell and/or its portfolio companies were prepared to make the best offer for companies brokered by Defendants but were denied the opportunity to do so because of Defendants' coordinated acts blacklisting them.

16. Defendants' actions have caused Stagwell damages of not less than $1 million, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Tortious Interference with Prospective Economic Relations
### (vs. Chadda)

1. Stagwell repeats and realleges the foregoing allegations as if fully set forth herein.

2. For many years, The Stagwell Group had a valuable business relationship with Petsky, and The Stagwell Group was regularly included as a potential acquirer when Petsky and/or Genuity were brokering the sale of a client within Stagwell's industry.

3. After The Stagwell Group rejected Mr. Chadda's proposal, in which Mr. Chadda had requested that The Stagwell Group pay him $1.5 million in return for services unnecessary to the Stagwell-MDC Combination, Mr. Chadda used his influence to exclude Stagwell from subsequent purchase and sale processes of relevant Defendant clients.

4. Mr. Chadda's interference and the resulting exclusion of Stagwell resulted in Stagwell's exclusion from bidding on, and likely being the successful bidder for, companies Defendants brokered for sale.

5. Mr. Chadda interfered with Stagwell's relationship with Petsky and Genuity through improper means including by, among other things, disparaging Stagwell and causing Defendants to exclude Stagwell and its portfolio companies from future transactions.

6. Mr. Chadda had no legitimate economic, business, or competitive reason for interfering with the prospective relationship between Stagwell on the one hand, and Petsky and Genuity on the other.

7. Mr. Chadda acted for the sole purpose and intention of inflicting harm on Stagwell and its portfolio companies. Mr. Chadda was not acting to secure a legitimate economic advantage for himself, nor for any legitimate competitive purpose, but solely to punish Stagwell for refusing to participate in the "pay to play" scheme.

8. But for Mr. Chadda's interference, it is reasonably certain that Stagwell would have participated in sale processes conducted by Petsky and/or Genuity and would have acquired one or more companies through those processes.

9. As a proximate result of Mr. Chadda's interference, Stagwell was deprived of the opportunity to acquire companies that would have enhanced the value of Stagwell's portfolio and would have provided economic benefit to Stagwell.

10. Because of Mr. Chadda's interference, Defendants continue to exclude Stagwell and its portfolio companies from bidding on target company clients, and Stagwell continues to suffer the harm of being unable to form beneficial business relationships with target companies represented by Defendants.

11. Stagwell is unable to reap significant financial benefits of such transactions where it otherwise would have done so.  This has occurred on several occasions and is expected to continue for as long as Mr. Chadda interferes with Stagwell's relationship with Defendants.

12. As a result of Mr. Chadda's interference, Stagwell has suffered damages of not less than $1 million, with an amount to be proved at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Stagwell requests that this Court:

A. Enjoin Defendants from continuing to exclude Stagwell and its portfolio companies from participating in acquisitions of companies represented by Defendants.

B. Enjoin Defendants from continuing to disparage Stagwell, including statements disputing Stagwell's credibility as an acquirer or that are otherwise damaging to Stagwell's business and reputation.

C. Award Stagwell damages for the lost economic value resulting from Defendants' refusal to allow Stagwell or its portfolio companies to participate in lucrative potential deals, in an amount to be proven at trial, but which is not less than $1 million.

D. Award Stagwell damages that resulted from Mr. Chadda's interference with Stagwell's business relationships and expectancy with Petsky and Genuity, which damages shall be proven at trial, but are not less than $1 million.

E. Award punitive damages to Stagwell to the fullest extent available.

F. Award attorneys' fees and costs incurred in this action to Stagwell to the fullest extent available.

G. Grant Stagwell such other and further legal and/or equitable relief as the Court deems fair and just.

[*remainder of page intentionally blank*]

**STAGWELL REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

DATED this 16th day of December, 2022.   Respectfully submitted,

/s/ John P. Curley
John Curley (NY State Bar No. 4737631)
jcurley@hnrklaw.com

HOGUET NEWMAN REGAL & KENNEY LLP
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165
Telephone: (212) 689-8808
Facsimile: (212) 689-5101

Charles Loeser (NY State Bar No. 5407937)
cloeser@hwglaw.com

HWG LLP
1919 M Street, NW, Eighth Floor
Washington, D.C. 20036
Telephone: (202) 730-1300 (office)
Telephone: (919) 504-9824 (direct)
Facsimile: (202) 730-1301

*Counsel for Plaintiff Stagwell Inc.*